## POTTER–WRIGHTINGTON, Inc., v. WARD BAKING CO.

(District Court, D. Massachusetts. March 20, 1923.)

### No. 1744.

1. **Trade-marks and trade-names and unfair competition ⬦93(3)—Evidence held to show plaintiff had established good will under trade-name.**

Evidence that plaintiff had adopted a trade-mark, consisting of a picture of an old grist mill and the name "Old Grist Mill," for the flour manufactured or sold by it, that it had extensively advertised its flour under that name, and had directed the public to communicate with it under that name, *held* to show that the name had become the commercial signature of plaintiff.

2. **Trade-marks and trade-names and unfair competition ⬦93(3)—Proof held to show attempt by defendant to appropriate plaintiff's good will.**

Proof that defendant adopted for its bread a label containing a picture similar to plaintiff's trade-mark, with directions to look for plaintiff's trade-name, and had simulated other advertising material of plaintiff, *held* to show an intent by defendant to sell its own products on the good will legitimately created by plaintiff.

3. **Trade-marks and trade-names and unfair competition ⬦93(3)—Evidence held to show defendant knew of plaintiff's use of trade-name.**

Evidence that defendant was an extensive advertiser, and kept in its files a record of trade-mark registrations, and that a bakery purchased by it had been using plaintiff's flour, and continued to do so after the purchase, *held* to show that defendant had knowledge of plaintiff's use of its trade-name, which had been registered as a trade-mark.

4. **Trade-marks and trade-names and unfair competition ⬦78—Flour dealer and baker held in competition with each other.**

A manufacturer and dealer in whole wheat flour, which had sought to increase the sales of its product by extensively advertising bread made from its flour, and had furnished bakers using its flour with wrappers bearing its trade-mark, is in competition with a baker selling similar bread in a wrapper which infringes plaintiff's trade-mark.

5. **Trade-marks and trade-names and unfair competition ⬦61—Flour distributor, furnishing wrappers for bread made from its flour, can be protected.**

The manufacturer and distributor of flour, who furnished wrappers to bakers using its flour for the bread baked by them, cannot be deprived of protection for his trade-mark and trade-name placed on such wrappers, on the contention that they failed to denote origin, and therefore could not be protected.

6. **Trade-marks and trade-names and unfair competition ⬦93(3)—Plaintiff held not to have unclean hands.**

In a suit for infringement of a trade-mark and unfair competition, proof that plaintiff was selling flour as whole wheat flour, though some part of the hull of the wheat had been removed therefrom, but that such flour was within the fair and generally accepted use of the term "whole wheat flour," *held* not to show plaintiff came into court with unclean hands, so as to defeat his right to enjoin unfair competition and infringement of his trade-mark.

7. **Trade-marks and trade-names and unfair competition ⬦71—Plaintiff's possible infringement of trade-mark of another does not entitle defendant to appropriate trade-name.**

The fact that plaintiff's trade-mark and trade-name may infringe the prior trade-mark of another, a question not to be decided, because the other was not a party to the suit, does not defeat plaintiff's right to have defendant enjoined from marketing its goods under a wrapper containing plaintiff's trade-mark and trade-name, since, even if the trade-mark did not belong to plaintiff, the element of unfair competition remained.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **Trade-marks and trade-names and unfair competition** ⊛⟶23—**Trade-marks are not rights in gross.**

Trade-marks are not rights in gross, like a patent or a statutory copyright.

9. **Trade-marks and trade-names and unfair competition** ⊛⟶68—**Trade-mark law is only part of unfair competition law.**

Trade-mark law is only a part of the broader field of unfair competition law.

10. **Trade-marks and trade-names and unfair competition** ⊛⟶84—**Use of plaintiff's trade-name by others after adoption by plaintiff does not make name public.**

The fact that other manufacturers and dealers, after the adoption of plaintiff's trade-mark and trade-name, had used the name and emblem. does not make the name or the mark publici juris, or otherwise aid defendant in his attempt to appropriate plaintiff's good will, by marketing his product under plaintiff's trade-mark and trade-name.

In Equity. Suit by Potter-Wrightington, Incorporated, against the Ward Baking Company, to restrain unfair competition and trade-mark infringement. Injunction issued.

Elder, Whitman, Weyburn & Crocker, of Boston, Mass., for plaintiff.

Wm. Quinby, of Boston, Mass., and Pennie, Davis, Marvin & Edmonds, of New York City, for defendant.

ANDERSON, Circuit Judge. By this suit in equity plaintiff seeks relief against alleged unfair competition and trade-mark infringement.

[1] About 1889, the firm of Potter & Wrightington, the predecessor of the plaintiff corporation, began dealing in flour, acting as commission merchants for mills in the West. Some three years later, they installed milling machinery in their plant in Boston, and ground wheat into wheat meal. Later they bolted out the coarser particles of bran, thus making what is commonly known in the trade as "whole wheat flour." About 1902, they moved into the five-story building, about 90x100 feet, in Charlestown, now occupied by them. In this they have milling machinery—rolling mills and three French burr stones —and two large baking ovens, used for baking dog biscuit, and at times for baking samples of bread made from their flour. In addition to wheat meal and whole wheat flour, they have manufactured rolled wheat, rye flakes, cereal coffee, wheat crackers, ginger cookies, dog bread, etc. When they put out the entire wheat flour, they adopted as a distinguishing mark therefor the name "Old Grist Mill." About 1893 or 1894, they also adopted a picture representing an old grist mill, alleged once to have existed in Scituate, Mass. These two forms of picture and words have been used by them continuously on their various products, and the packages and cartons containing them, for approximately 30 years.

The plaintiff's immediate customers are mostly bakers and grocers. In order to increase their sales, plaintiff sought to reach the ultimate consumer of flour by creating a demand for bread made of Old Grist Mill flour. To that end it furnished, to 1,000 or more baker customers, wrappers; about 300 to a barrel of flour, intended to be wrapped around the middle of the loaf. One of these wrappers is

hereto annexed and marked "Exhibit A." This wrapper is headed "Old Grist Mill Health Bread," with a picture of a loaf of bread in a wrapper showing the old grist mill thereon, and a space for inserting the name of the particular baker selling the bread made of Old Grist Mill flour. It also has a premium list of prizes "given only to customers of bakers using the Old Grist Mill flour." To secure such premiums the bread buyer was told to cut out the picture, with the baker's name thereon, and send the slips, with postage, to "Department X, Old Grist Mill, Charlestown, Mass." They thus adopted in this advertising and premium business the term "Old Grist Mill" as their name, for the purpose of receiving mail. The premiums ran from an "Old Grist Mill" cook book for three wrappers, to a watch for 10,000 wrappers. The wrappers also contain an offer of a special prize of $15 for the "baker, driver, or saleslady sending the largest number of coupons," and so on. Printed in large letters on each side of this wrapper are the words:

"No wrappers redeemed that have not been used on 'Old Grist Mill' health bread."

This and much other analogous advertising show clearly how the plaintiff built up a good will in Old Grist Mill flour, by inducing consumers of bread to demand of their bakers and grocers bread made of this flour. Later a different form of waxed wrapper was adopted, but it shows the Old Grist Mill picture. Various other forms of advertising, featuring the old Grist Mill, were used by the plaintiff, such as billboard posters, 8x10 feet in dimensions, posted in Pennsylvania, New Jersey, and New York. Demonstrations at times were given of the merit of bread made of Old Grist Mill flour in grocery stores and food fairs, and at one time in Philadelphia at a regular market stall. At times there was house to house canvassing, selling packages of various products made from Old Grist Mill flour. Cookbooks were used to advertise the flour and other Old Grist Mill products.

In such advertising—directed towards bringing Old Grist Mill products into public favor, and identifying them with the plaintiff—the plaintiff expended, in the years 1908–1921, inclusive, upwards of $340,000. The volume of their business was substantial, running from about $300,000 a year to something over $700,000 a year. Both the words "Old Grist Mill" and the picture were registered as trade-marks in the United States Patent Office, and at the proper offices in Massachusetts and California. These marks also have appeared on the stationery and bills of the plaintiff and its predecessors since 1898. Their goods were marketed in New England, New York, New Jersey, Pennsylvania, District of Columbia, Maryland, Illinois, California, and more or less in other states.

The grist mill was one of the first public utilities in pioneer days. To it our forefathers took the grain, where it was ground, sometimes bolted or sifted, receiving back meal or flour; the miller keeping the bran or a portion of the grain as toll. The phrase "Old Grist Mill" and the picture suggest in attractive form the simple and supposedly wholesome habits and diet obtaining in days of old. Both the words

and the emblem were, therefore, a desirable and effective means of advertising the merit, or supposed merit, of whole wheat flour as superior to ordinary white flour, from which practically all of the outer covering of the wheat has been taken. It was an advertising concept of intrinsic merit.

It is also clear that, by advertising and pressing its products upon the trade for a period of 30 years, the plaintiff established a substantial good will, connected in the public mind with this name and emblem. Plaintiff was, for practical and business purposes, the Old Grist Mill, and its products were Old Grist Mill products. "Old Grist Mill" became the commercial signature of the plaintiff. United Drug Co. v. Rectanus Co., 248 U. S. 98, 39 Sup. Ct. 48, 63 L. Ed. 141.

[2] The defendant is a large baking concern, with branches in various parts of the United States. Early in 1922 it manufactured and put upon the market a whole wheat bread called "Home Spun," put out in a wrapper with a picture thereon of an old grist mill, substantially like the plaintiff's emblem, and has sold approximately 10,-000,000 loaves of this bread. It has also carried on for the past year an extensive advertising campaign, in which the picture of an old grist mill, very like the plaintiff's, is a prominent feature, containing the words, in large letters, "Look for the Old Grist Mill."

Some time ago the plaintiff put out a card on which was a fan-shaped picture of such mill, with the words:

> "Back of the loaf is the snowy flour,
>   And back of the flour the mill,
> And back of the mill is the wheat and the shower,
>   And the sun and the Father's will."

In advertising since January 1, 1922, the defendant, on pictures showing the Old Grist Mill, has varied the words as follows:

> "Back of the loaf is the Whole Wheat Flour,
>   *Which is ground at the old grist mill,*
> And Back of the mill is the wheat and the shower,
>   And the Sun and the Father's will."

It would be hard to conceive of plainer evidence of an intent to appropriate all possible advantage derivable from the original conception of the Old Grist Mill, as suggesting whole wheat flour, as well as the advantage accruing from the plaintiff's 30 years of advertising and use of the term and the emblem as signifying whole wheat flour. The use of the name "Ward," in connection with Old Grist Mill and the picture, is intended and calculated to lead the bread-buying public to believe that the Ward Company, and not the plaintiff, is the original "Old Grist Mill" concern. Taylor v. Carpenter, 3 Story, 458, Fed. Cas. No. 13784. Such action aggravates the injury done by its misappropriation of the plaintiff's "commercial signature." It shows wrongful intent, not purpose to sell its own products on the good will legitimately created therefor.

[3] The defendant is an extensive advertiser, and keeps in its files a record of trade-mark registrations. About 1912 it bought a bakery in Newark, N. J., which was using substantial quantities of the plaintiff's Old Grist Mill flour, and selling its bread in wrappers received

from the plaintiff. After this purchase, this branch of the defendant continued to use substantial quantities of the plaintiff's Old Grist Mill flour, and received from the plaintiff, and used, some 14,000 or 15,000 of its Old Grist Mill wrappers. That some of defendant's managers knew of such use of this flour and these wrappers seems certain.

In February, 1922, promptly after learning of the defendant's use of the words and the picture of the Old Grist Mill, the plaintiff notified the defendant of its claim of infringement. The defendant denied infringement, refused to discontinue, and has carried on an extensive advertising campaign, so that in about 10,000,000 copies of newspapers advertisements have appeared seeking to identify in the public mind the defendant as the Old Grist Mill concern.

While the defendant denies that it knew of the plaintiff's use of the Old Grist Mill name and emblem before adopting them in the early part of 1922, the evidence, taken in connection with its subsequent course of conduct, grounds the conclusion that the defendant did know of the plaintiff's rights, and deliberately intended to appropriate to itself, so far as practicable, plaintiff's good will arising from the plaintiff's prior adoption of the emblem and phrase, and the good will created by the plaintiff's advertising and use thereof for a period of about 30 years. The wrongful conduct was deliberate and persistent. It is a plain case of undertaking to appropriate the plaintiff's property, and to mislead the public into buying defendant's products, when plaintiff's products are desired.

I turn now to the defense:

[4] (1) Defendant contends that it is not in competition with the plaintiff, because the plaintiff is a manufacturer and dealer in flour, whereas the defendant is a baker. But both are seeking to enlarge their markets by attracting the ultimate consumer of wheat, mainly eaters of bread. Both seek to direct the favor of the bread-purchasing public toward whole wheat bread, as more wholesome and nutritious, and to accustom the bread buyers to call for such bread as made of Old Grist Mill flour. The fact that the defendant buys flour and manufactures it into bread, which is in large part distributed to the consumers through grocery stores, while the plaintiff is both manufacturer of and dealer in flour, which it sells chiefly to the bakers, does not prevent the essential relation between the two concerns from being competitive. Willys-Overland Co. v. Akron Overland Tire Co. (D. C.) 268 Fed. 151; Aunt Jemima Mills Co. v. Regney & Co., 247 Fed. 407, 159 C. C. A. 461, L. R. A. 1918C, 1039; Edgar-Morgan Co. v. Alfocorn Co. (D. C.) 270 Fed. 344.

[5] (2) Defendant contends that, as the wrappers furnished by the plaintiff to its 1,000 or more baker customers were intended to carry the particular baker's name as the maker of the bread, the trade-name and emblem fail to denote origin, and cannot be protected.

In effect, this is nothing but the contention just dealt with. The fact that the wrappers were intended to direct the ultimate consumer's attention to a particular baker did not prevent their having also the effect of inducing trade for Old Grist Mill flour made by the plaintiff.

For present purposes, it is immaterial whether the baker be an independent trader or a mere distributing agent of the flour manufacturer and dealer. The natural and intended effect of plaintiff's advertising was to induce wheat consumers to buy wheat in the form of bread made of Old Grist Mill flour, and it was this trade, thus induced, that the defendant seeks to appropriate to itself.

[6] (3) The defendant's claim that the plaintiff is in court with unclean hands finds little or no support in the evidence, fairly analyzed. The gist of the contention is that the plaintiff, by advertising connected with the Old Grist Mill name and emblem, falsely represented that the Old Grist Mill flour was an entire or whole wheat flour, when in fact some small part of the bran or hull had been taken out. It is at least a debatable question as to whether wheat *flour,* as distinguished from wheat *meal,* does not require the elimination of some part of the hull of the wheat. The plaintiff's flour was, within the fair and generally accepted use of the term, a whole, wheat flour. It was radically distinguished from ordinary wheat *flour,* from which the entire hull, and what is commonly called "middlings" have been eliminated.

There is nothing in the rather meager evidence concerning the suggestions or action of the federal pure food authorities or those of New York to affect the conclusion which a court should reach on the evidence itself. Without detailed review, it is plain on all the evidence, and I so find, that the plaintiff intended to deal honestly and fairly with the purchasing public; that its product, made in its own mill, was essentially what it advertised it to be; that as to flour purchased from other makers it exercised care and diligence to procure and market flour made as advertised by it. The defense of unclean hands cannot be sustained. Compare American Thermos Bottle Co. v. Grant Co. (D. C.) 279 Fed. 151; Id. (C. C. A.) 282 Fed. 426.

[7] (4) Defendant's most plausible contention is that, if and in so far as the plaintiff's case is what is sometimes called a technical trade-mark case, the plaintiff's use was anticipated by an alleged similar use by Frank L. Thornton of Providence, R. I. There is evidence tending to show that in 1892, before the plaintiff started in the use of the name and emblem of the Old Grist Mill, Thornton, who was carrying on a small local business as a dealer in corn meal, graham flour, and a line of cereals, adopted a similar emblem (but not the name "Old Grist Mill"), registered it as a trade-mark, and used it in connection with his business carried on in Providence and vicinity. It also appears that in 1900 Thornton assigned this trade-mark to one Hoxie, who brought a suit for infringement against the predecessor of the present plaintiff in the Circuit Court for this district. A demurrer was filed, apparently argued, and leave given to the plaintiff to file an amended bill, on payment of costs. An amended bill is in the files, but apparently was not allowed, because of the nonpayment of costs. The amended bill, if it be treated as evidence, shows Thornton had assigned all his alleged rights in the trade-mark to Hoxie and one Davis, taking back a revocable license.

The case stood without action until 1905, when it was dismissed for lack of prosecution. There is meager evidence to the effect that

the Thornton concern was incorporated, and is still carried on, apparently by a grocery house that, as a creditor, took over the stock of the corporation. How far, if at all, such trade as the concern may now have is connected with the grist mill picture does not clearly appear. Nor does it appear what rights, if any, in the trade-mark, the present concern has or claims to have.

[8] On this record, it is manifestly impossible to determine what rights, if any, against the present plaintiff the Thornton concern may have in this trade-mark or trade-name. The Thornton Company is not before this court. Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713; United Drug Co. v. Rectanus Co., 248 U. S. 90, 97, 39 Sup. Ct. 48, 63 L. Ed. 141. But it seems clear that, even if the Thornton Company may have for some purposes and in some territory a right in the trade-mark superior to that of the plaintiff, the defendant is not thereby exonerated from responsibility for its manifest attempt to appropriate to itself a good will created by the plaintiff's advertising and long course of business. Defendant is not seeking to protect any rights of the Thornton Company; it is trying to misappropriate property, belonging to the Thornton Company, or to the plaintiff, or to both. Whether or not, in case of another suit by the Thornton concern against the plaintiff, abandonment, laches, estoppel, or limitation in territory could be successfully urged, cannot now be determined. But it is on all the record, I think, clear, and I so rule, that such use as was made of a similar emblem by the Thornton Company did not destroy the plaintiff's rights as against this defendant. Trade-marks are not, as pointed out by Mr. Justice Pitney, in Hanover Star Milling Co. v. Metcalf and United Drug Co. v. Rectanus Co., supra, rights in gross, like a patent or a statutory copyright.

[9] It is now settled that trade-mark law is only a part of the broader field of unfair competition law. Many earlier dicta, probably some earlier decisions, are not now safe guides. Compare Rectanus Case, 248 U. S. 97, 98, 39 Sup. Ct. 48, 63 L. Ed. 141.

It follows that, even if, on litigation between the plaintiff and the Thornton concern, the plaintiff should be found disentitled to an exclusive use, everywhere, of the Old Grist Mill trade-name or the emblem, one or both, the defendant does not thereby acquire rights, either as a part of the general public, or in any other way, to appropriate to its own use a public demand for whole wheat flour created by the plaintiff's advertising and course of business. There is at least a case of unfair competition. Ammon & Person v. Narragansett Dairy Co. (C. C. A.) 262 Fed. 880; O'Sullivan Rubber Co. v. Genuine Rubber Co. (C. C. A.) 279 Fed. 972.

[10] (5) Use of the name and emblem by other manufacturers and dealers, all long after the plaintiff's adoption of the name and mark, cannot avail the defendant. Such uses may constitute infringement on the plaintiff's rights, or they may fall within the limitations on trade-mark uses pointed out in the Hanover Milling and Rectanus Cases, supra. But they do not make the name or the mark publici juris or otherwise help the defendant.

As the case is said to be destined for the Court of Appeals, on plaintiff's right to injunctive relief, no detailed evidence as to damages or profits has been received. An injunction must issue, and, if sustained by the court above, plaintiff may apply for leave to offer further evidence as to its right to a money recovery.