**G. D. SEARLE & COMPANY, a corporation, Plaintiff,**

v.

**MDX PURITY PHARMACIES, INC., a corporation, and Daylin Medical and Surgical Supply, Inc., a corporation, doing business as Daylin Products, Defendants.**

**No. 66–2087.**

United States District Court
C. D. California.

Aug. 1, 1967.

526

Sidley & Austin, Chicago, Ill., and Mc-Cutchen, Black, Verleger & Shea, by Philip K. Verleger and Jerome A. Hoffman, Los Angeles, Cal., for plaintiff.

Stanley Fleishman, by Harold Rosenberg, Hollywood, Cal., for defendants.

## MEMORANDUM OPINION FOR USE IN PREPARATION OF PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT.

CRARY, District Judge.

Plaintiff, an Illinois corporation, since about 1934, has been and now is the manufacturer and marketer of a bulk laxative under the registered trademark of METAMUCIL. The trademark was registered on October 2, 1934. The product is a non-prescription ethical drug containing a derivative of psyllium seed and dextrose.

Defendant MDX Purity Pharmacies (MDX), a California corporation, is a wholly owned subsidiary of Daylin Medical and Surgical Supply, Inc., doing business as Daylin Products (Daylin). Daylin has, at least since the fore part of 1967, been actively engaged in marketing a bulk laxative substantially the same or identical to that of plaintiff under the name of MUCILIN, also a non-prescription drug.

Invoices in evidence from Riders, Ltd., to Daylin (Defts.' Exs. A and B) indicate that in May, 1962, there was invoiced to Daylin 228 16-ounce cans of a product under the name of "CAL MUCIL" at 70 cents each and in October, 1962, there was invoiced to Daylin 7 dozen cans of MUCILIN at 70 cents each. Defendants' Exhibits G-1, G-2 and G-3 evidence sale by Daylin to Unimart Pharmacy, San Diego, of 2 dozen cans of MUCILIN on October 9, 1962, and 2 dozen cans to Unimart Pharmacy, El Cajon, on October 23, 1962, and 2 dozen cans of MUCILIN to Govway RX Pharmacy on October 9, 1962. These are the only Exhibits disclosing sales between 1962 and 1967.

There was testimony of defendants' witness Marshall, Assistant Operations Manager of Daylin, that MUCILIN was shipped to all Daylin stores from late 1962 to date. The evidence does not disclose the amount of MUCILIN delivered to Daylin stores during the period 1962 to 1967 and the court concludes that little, if any, MUCILIN was offered for sale by Daylin on the shelves of their stores from 1962 to 1967, since, although sales personnel of plaintiff visited all of the Daylin stores which sold METAMUCIL about every six weeks during the period involved, all plaintiff's salesmen testifying stated they did not see MUCILIN in the stores until February or March, 1967. These salesmen visited the Daylin stores to check on their displaying of METAMUCIL and viewed such displays on the Daylin shelves. It was also their duty to observe and evaluate competing products on these tours of drug stores marketing METAMUCIL. It appears to the court that if Daylin's product, MUCILIN, was on defendants' shelves from 1962 to 1967 in the area in which the store displayed bulk laxatives it would have been noticed by plaintiff's salesmen and reported to plaintiff as it was in February

or March of 1967. It is true that Mr. Ram, plaintiff's patent attorney, testified that he first learned of the defendants marketing of MUCILIN from plaintiff's attorney Verleger, who had been advised by defendants' counsel about February of 1967 that defendants would abandon the use of the name META-MED but continue to market a product similar to plaintiff's under the name of MUCILIN. This was about the same time salesmen stated they observed MUCILIN on the shelves of Daylin drug stores next to and mingled with METAMUCIL.

· Defendant MDX manufactured and sold a bulk laxative product the same as MUCILIN and METAMUCIL under the name of META-MED from July, 1966, to December, 1966, when MDX merged with Daylin.

Violation of the Lanham Act, Title 15, U.S.C., Chapter 22, and unfair competition are asserted by plaintiff.

The issues to be determined are (1) whether the buying public in the circumstances involved are or were *likely* to be confused, mistaken or deceived, into believing defendants' product to be the product of plaintiff or in any way connected with plaintiff or its product, (2) have the defendants sought to confuse or deceive the buying public, by use of the name MUCILIN or META-MED, into believing defendants' product to be or connected with plaintiff's product, (3) is defendant attempting to palm off its product MUCILIN as the product of plaintiff or having any connection with plaintiff's product, and (4) is MUCILIN or was META-MED a copy or colorable imitation of plaintiff's trademark METAMUCIL.

Plaintiff has expended substantial sums in advertising METAMUCIL in medical and pharmaceutical trade magazines and journals. It is to be noted that plaintiff at no time advertised METAMUCIL in or by newspapers, magazines, television, radio, or any advertising media other than publications subscribed to by doctors and pharmaceutical houses. Plaintiff's effort to create a market for METAMUCIL was by having doctors recommend its use to their patients. In addition to the advertising noted above, plaintiff delivered thousands of documents, brochures, and samples of META-MUCIL to doctors throughout the country.

Approximately 55% of the bulk laxative sold is METAMUCIL. In 1966 its sales totaled about eight million dollars, two million of which were sales in California. About 80% of the METAMUCIL sold was through recommending the product by doctors to their patients, the balance by word of mouth of users and friends.

METAMUCIL was, until recently, packaged in 16 (Ex. 2), 8 and 4-ounce round cans. Presently it is marketed in 14-ounce and smaller plastic, cylinder shaped containers of the same appearance as the 16-ounce can. The label on all containers has a white background with green lettering, except the word METAMUCIL is in white letters on a green oblong background (Plaintiff's Ex. 2 and 3).

META-MED was produced and sold by MDX for only about five months in 1966, at the end of which time, December, 1966, MDX merged with Daylin. META-MED was sold in 16-ounce cans. The label was also in green lettering on a white background (Pltf.'s Ex. 5). The description of META-MED as "a natural vegetable powder" and its operation and direction for use appearing on the front of the container was identical to that of METAMUCIL. Defendants state they discontinued the use of META-MED in December, 1966, and do not intend presently at least to market the product under the name of META-MED. No reason for the use of the name META-MED was given by defendants.

No container in which MUCILIN is alleged to have been sold prior to the fore part of 1967 is in evidence. The label and container in which MUCILIN has been sold commencing the fore part of 1967 appears in plaintiff's Ex. 6. The front of this label has a background about 70% of which is black in color with white lettering, 20% blue with black lettering,

and about 5% white (lower left hand corner in which appears a large black D below which is the name "Daylin" in black letters). The entire back of the label is white with black lettering and the nature of the product and directions for its use are not similar to that of plaintiff's METAMUCIL.

There is also on the bulk laxative retail market a psyllium powder product sold by Winthrop Laboratories under the registered trademark of MUCILOSE. This name was registered in May, 1935, about seven months after plaintiff registered METAMUCIL.

Plaintiff's patent counsel, Mr. Ram, testified plaintiff had not objected to the registering of the name MUCILOSE nor had made any effort to cancel the registration. He was not sure contest of the mark MUCILOSE was now barred but to determine same he would need a great deal of information which would have been in files of plaintiff some forty years old, which had long since been destroyed.

The evidence discloses that Winthrop's product MUCILOSE has been on the market since approximately 1935, and whether it must be deemed to weaken plaintiff's mark and, if so, to what extent, is to be determined herein. The evidence further shows that sales of MUCILOSE, a nationally distributed product, over many years, represented in 1966 only about 1.9% of the market and approximately 1.2% of the market in the Pacific area. METAMUCIL had a 3.1% increase in sales in 1966 over 1965 whereas MUCILOSE sales declined 0.9%. Daylin does not sell MUCILOSE.

In National Lead Company v. Wolfe, 223 F.2d 195 (C.A.9, 1955) at page 204, the court discusses the effect of the use of a like name by a third party, stating:

"The remaining proven third party uses of the word 'Dutch' in connection with paint sale or manufacture are too inconsequential to establish a claim of *publici juris* or the claim that appellant's mark has become a weak mark or to justify on any other theory the acts of these appellees. It may be that some of these third persons may also have been guilty of wrongful infringement, but such would not be a defense or justification for the appellees. It is no excuse for them to say that others have been guilty of the same wrong. Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 34 F.2d 774; Potter-Wrightington, Inc. v. Ward Baking Co., 1 Cir., 298 F. 398, affirming D.C., 288 F. 597."

The defendants cite Sterling Drug v. M–A Pharmaceutical Corp., 343 F.2d 1016, 52 CCPA 1265 (1965). At page 1017 of that opinion, the court refers to Conde Nast Publications, Inc. v. American Greetings Corp., 329 F.2d 1012, 51 CCPA 1176 (1965), which concerns the use of the name "Vogue" as a trade name for greeting cards. In commenting on the effect of the use of a similar name by third parties, the court states at page 1014:

"As we have noted, the board found, with abundant support of record, that the term "VOGUE" had become exceedingly well known in the publishing field as an indicator of origin for the magazine originating with appellant. Such distinctiveness has not, in our judgment, been overcome by the third-party registrations.

"We consider apposite to the situation here the principle stated by this court in Clinton Detergent Company v. Procter & Gamble Co., 302 F.2d 745, 49 CCPA 1146. With reference to some 63 third-party registrations of the word 'joy' by itself as well as in combination with other words and designs for a wide variety of goods, the court observed that such registrations 'are evidence which we consider with other pertinent evidence on the issue of alleged distinctiveness of the mark' but, that such registrations 'are not conclusive evidence on this issue'."

This court concludes that the use of the mark MUCILOSE by a small competitor in the field does serve to weaken the mark METAMUCIL but by reason of MUCILOSE taking only 1.2% of the market in the Pacific area its effect is small, of little if any impact on plaintiff's

sales and is not decisive of the issues here involved.

The evidence does not show that the defendant Daylin has advertised MUCILIN in newspapers or otherwise. It has on a few occasions advertised plaintiff's METAMUCIL in the newspaper and Daylin sales of METAMUCIL have always been far greater than that of MUCILIN. It is noted that the standard price of METAMUCIL is about $2.88 whereas MUCILIN sells for $1.89 for the 16-ounce package. Daylin has approximately one hundred stores at the present time and plans substantial expansion in the retail drug field. All Daylin stores are self-service.

Mr. Heldfond has been the marketing director for Daylin since September, 1965, and was employed by Daylin to take over its private formula program. He testified that the new label on MUCILIN which was adopted in November or December, 1966, was his suggestion as to the colors used and was part of a plan for obtaining uniformity in label colors as to Daylin's private brand products. He was aware of METAMUCIL and MUCILOSE when he changed the label on MUCILIN but thought "mucil" was a generic term and consequently there was no reason to change the name MUCILIN. The use of a name for a private brand product similar to that of a standard brand, he indicated, is helpful to the sale of the private brand, and if the name of your product sounds like the product in the field it is advantageous in marketing, and common sense would dictate that the fact METAMUCIL is the best known bulk laxative which is a product of psyllium seed is one of the reasons for displaying MUCILIN beside it.

The collocation M–U–C–I–L does not appear to be a generic term such as "cola", which has been held to have " * * * a descriptive significance apart from its use in the trademark Coca Cola, and has become a generic term, generally used to indicate a class of beverage." Dixi-Cola Laboratories v. Coca-Cola Co., 117 F.2d 352 at 355 (4 C.A.1941). The letters "mucil" are not descriptive of anything.

The court concludes that Daylin adopted the name of MUCILIN for its product because it was similar to METAMUCIL and for the purpose of attracting the attention of the buying public to same and Daylin shelved and displayed MUCILIN side by side and sometimes intermixed with METAMUCIL because that product was the leader in the field, was known for its excellence and Daylin hoped that customers would be attracted by the name MUCILIN and might well purchase it instead of METAMUCIL by reason of its similarity in content and economy in price.

As said by the court in Frostie Co. v. Dr. Pepper Co., 341 F.2d 363 (5 C.A. 1965) at page 365:

"Obviously, appellee would not have used this legend had they not intended thereby to attract purchasers."

The court there held that "Frosty Pepper" was likely to be confused with the trademark "Frostie", both being soft drinks.

Defendants had and have every right to compete with the plaintiff's product with one of their own but it does not seem fair or equitable that defendants should use a name so close to that of the plaintiff's trademark and market its product so as to use the good will and excellence of plaintiff's product, which was built at great expense and effort to effect the sale of METAMUCIL.

The determination of just how close to a trademark name a prospective competitor may come without infringing is not usually a simple matter. Each case must be decided on its own facts. Had defendants competed with the same product under the name of "psyllium" or one of many other names not similar to that of plaintiff's, the problem herein would not have arisen.

Although the defendants may not have intended to cause confusion or the likelihood of same, certainly defendants hoped for and sought a benefit from the use of a name similar to METAMUCIL. It had been Daylin's practice to use names for several of its other products which overlap with those of well known standard

brands for similar products, such as plaintiff's "Maldrox" which overlaps with "Malox".

The case of Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9 C.A.1963), involved the use of the name "Black & White" for beer marketed by defendant. Plaintiff sold Scotch whisky under the trademark "Black & White". In holding the plaintiff's trademark was infringed, the court, at pages 157–158 of the opinion, states:

"It is well settled that plaintiffs were not obliged in order to make a case against the defendants to prove a wrongful intent. Safeway Stores, Inc. v. Rudner, 9 Cir., 246 F.2d 826, 829. But when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit. American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560, 562; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603; National Van Lines v. Dean, 9 Cir., 237 F.2d 688, 692. As was said in the last cited case: '[I]f such an intent is shown, it raises a presumption that deception and confusion resulted.' "

To the same effect is the comment in paragraph "f" to § 729(b), Restatement of Torts, quoted in footnote 10, page 202, of National Lead Company v. Wolfe, 223 F.2d 195, supra:

"But if he adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, his intent may be sufficient to justify the inference that there is confusing similarity."

■ The Court of Appeals, 9th Circuit, in Paul Sachs Originals Co. v. Sachs, dba Sachs of California, 325 F.2d 212 at 214 (C.A.9, 1963), sets forth the factors to be considered in determining likelihood of confusion as follows:

"A fairly good summation of these factors is found in Chester Barrie, Ltd. v. Chester Laurie, Ltd., 189 F. Supp. 98, 101 (S.D.N.Y.1960):

'Material to a determination of the "likelihood of confusion" are inter alia: the area of concurrent sale; the extent to which the goods are related; the extent to which the mark and the alleged infringing name are similar; the "strength" or novelty of the plaintiff's mark; evidence of bad faith or intention of the defendant in selecting and using the alleged infringing name; and, evidence of actual confusion.'

Obviously, whether any or all of these factors weigh in favor of the relief sought is a matter to be determined in the first instance by the trial court on the facts of the particular case, and each case must stand on its own facts."

Applying these factors to the case at bar, it appears (a) the products of the parties are sold in the same area, in the same stores and displayed side by side on shelves and otherwise, (b) the goods are for all general purposes identical, (c) both marks contain the letters "mucil", (d) plaintiff's mark is strong and novel except for some weakness in a lesser degree resulting from the Winthrop trademark "MUCILOSE", (e) it appears that defendants' intent as to MUCILIN and META-MED was not to palm off their products as being the product of plaintiff, but the court concludes defendants did intend to use a name close to that of plaintiff's in the hope the similarity would give defendants an advantage and that they would benefit from the excellence of plaintiff's product and good will, and (f) there is no evidence of actual confusion.

In the Sachs case, the court found there was no likelihood of confusion and that there was no overlap of markets of significance. The dresses concerned were aimed at different markets and a dress by one of the companies would not fit a woman who could wear the dress of the other. There was no evidence of bad faith by defendant, as the defendant had

never heard of plaintiff prior to the suit. The marks were found to be dissimilar and unlikely to cause confusion. The court in the Sachs case also found the products of the parties to be readily distinguishable by a customer.

Defendants strongly rely on Fieldcrest Mills, Inc. v. Couri, Murad & Co., 220 F. Supp. 929, S.D.N.Y.1963, as dispositive of the instant matter. There plaintiff asserted its trademark "Karastan" was infringed by defendant's mark "Couristan." Plaintiff's mark, registered April 15, 1930, was used on domestic loomed rugs having patterns of Oriental rugs and defendant's mark was used in the marketing of imported handmade Oriental rugs. Defendant had used "Couristan" since 1926 and Couri was a family name. The suffix "stan" was frequently used in nomenclature of Oriental rugs. The rugs bearing the respective marks had sold in retail stores almost side by side since about 1928 with but two minor incidents of confusion. The court also noted that " * * * each of the parties is well known for particular products offered for sale (though Karastan is on a larger scale) without any confusion resulting between the two." The court dismissed plaintiff's complaint. The difference in facts between the Fieldcrest Mills case and the case at bar make them readily distinguishable.

■ The cases concerning trademark infringement and unfair competition are profuse in number and some appear to be contradictory with respect to general rules announced. In the circumstances, this court will, of course, follow the rulings of the Court of Appeals of the 9th Circuit, several of which are referred to throughout this Memorandum Opinion. Defendant Daylin was a second party in the field in the case at bar by many years and it is well established that such second party must keep far enough away to avoid all possible confusion. As stated by the court in Northam Warren Corp. v. Universal Cosmetic Co., 18 F.2d 774 (7 C.A.1927), at 775:

"One entering a field of endeavor already occupied by another should, in the selection of a trade-name or trade-mark, keep far enough away to avoid all possible confusion. We can see no purpose or reason for the selection of 'Cuticlean' by one entering the field where another is doing a similar business using as its trade-mark 'Cutex,' except it be done with the hope that benefit might accrue from the similarity. * * *"

See also Stork Restaurant v. Sahati, 166 F.2d 348 (9 C.A.1948), at page 355, where the court says:

"In other words, there is little likelihood that the appellant's predecessors and the appellees' predecessor hit upon the names 'The Stork Club' and 'Stork Club', respectively, as acts of independent creation. It seems a clear case of a junior appropriator's seeking to capitalize on the prestige of the senior, of which more hereafter.

"Equity gives a greater degree of protection to 'fanciful' trade names than it accords to names in common use."

■ It would appear that one who learns of the product METAMUCIL but not the name of the manufacturer is likely to be misled into purchasing MUCILIN. Where products are virtually identical, the degree of similarity in trademarks necessary to support a finding of infringement is less than in case of dissimilar, non-competing products. David Sherman Corp. v. Heublein, Inc., 340 F. 2d 377 at 382 (8 C.A.1965).

■ The degree of confusion that must be established to constitute infringement is not set forth in the authorities. A lesser degree should be sufficient unless, of course, the likelihood of confusion would be de minimis.

In G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 265 F.2d 385 (D.C.C.A. 1959), the plaintiff sought to enjoin defendant's use of "Bonamine" for its product which was a remedy for motion sickness. Plaintiff's trademark "Dramamine", also for motion sickness, was registered in 1950. Both were sold without prescription. Defendant came on the market in 1953, at which time it knew of

plaintiff's use of the trademark "Dramamine" and its predominant position in the trade. The defendant issued instructions to its salesmen stating: "Dramamine has been on the market for a number of years and has been intensely promoted; consequently its biggest advantage now is that physicians have the Dramamine habit." At page 387, the court points out:

"The statement which we made a number of years ago in Northam Warren Corp. v. Universal Cosmetic Co., 7 Cir., 1927, 18 F.2d 774, 775, is a good and safe rule to follow: 'One entering a field of endeavor already occupied by another should, in the selection of a trade-name or trade-mark, keep far enough away to avoid all possible confusion.' * * *."

In holding that Dramamine was a strong, non-descriptive name (page 387), the court went on to say, at page 389:

"The evidence as to actual confusion or likelihood of confusion differs widely from case to case. However, courts are alert to protect the purchasing public from the conduct of business concerns which do not hesitate to trade upon the good name and the success of a competitor. We think the evidence in this case compels a holding that the trademark 'Bonamine' is likely to cause confusion and mistake among the purchasers of drugs who seek relief from motion sickness. Defendant adopted the name 'Bonamine' apparently with the idea of getting as close to 'Dramamine' as was legally possible, but we hold the evidence in this case discloses that defendant got too close."

 The lack of evidence of confusion is, of course, to be considered but is not controlling in determining likelihood of confusion. The court, in David Sherman Corp. v. Heublein, Inc., 340 F.2d 377, observes, at page 380:

"We recognize that the courts have regarded the absence of actual confusion as an important factor. Indeed, on occasion they have gone so far as to say that the best test of proving likeli-

hood of deception is actual deception itself."

On page 381, the court goes on to say:

"We do not ignore the experience of the market place. But none of the cases which we have cited or which have been cited to us, as we read them, abandons likelihood of confusion as the governing test or goes so far as to hold that likelihood of confusion is not the applicable criterion even when there has been simultaneous sale for a period of time without a proved example of actual confusion. The courts have given full impetus to the statutory standard. They have recognized that it is usually difficult to ferret out instances of actual confusion even though they exist. And they have not accepted mere passage of time as a factor which avoids or which renders inapplicable the stated statutory standard."

To like effect, G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385 at 387.

 The law is well settled that where there is a doubt as to the right of a newcomer to use a name likely to cause confusion with the first user, the doubt shall be resolved in favor of the first user. United States Time Corp. v. Tennenbaum, 267 F.2d 327, 328, 46 CCPA 895 (1959). There defendant's name "Telix" was held likely to be confused with plaintiff's trademark "Timex". Both names were for use on watches. Polymer Corp. v. Dayco Corp., 324 F.2d 1019 at 1020, 51 CCPA 794 (1963). Defendant's "Nylaflex" was held likely to be confused with plaintiff's "Nylaflow". Nylaflex was a trademark for vacuum and hot air hoses; Nylaflow was used by defendant on synthetic resin tubing.

 The court finds that the delay between the time plaintiff had notice of defendants' use of "MUCILIN" and the filing of the amended complaint herein was not more than a few months. In any event it appears that in the 9th Circuit laches in a case of this type does not bar injunctive relief although unreasonable delay may bar an accounting for past

profits. Stork Restaurant v. Sahati, 166 F.2d 348 at 363 (9 C.A.1948).

For the reasons and authorities set forth hereinabove the court concludes, having in mind the facts and circumstances in the case (a) that the buying public was and is likely to confuse defendants' products META-MED and MUCILIN with plaintiff's METAMUCIL, that defendants have infringed plaintiff's trademark and plaintiff is entitled to injunctive relief, (b) that the defendants intended to benefit from the excellence of the product of plaintiff and its good will in respect thereto by naming their same product, META-MED and MUCILIN and in the labeling of the package in which META-MED was sold but that defendants did not intend to palm off META-MED and MUCILIN as the product of plaintiff.

Counsel for plaintiff is requested to prepare, serve and lodge Findings of Fact, Conclusions of Law and Judgment in conformity with Local Rule 7.

This Memorandum is not to be deemed a final Judgment.